Mark R. Thierman, Nev. Bar No. 8285
mark@thiermanbuck.com
Joshua D. Buck, Nev. Bar No. 12187
josh@thiermanbuck.com
Leah L. Jones, Nev. Bar No. 13161
leah@thiermanbuck.com
THIERMAN BUCK, LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel. (775) 284-1500
Fax. (775) 703-5027

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| RAYMOND SULLIVAN and JULIA CAUSEY, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>RIVIERA HOLDINGS CORPORATION d/b/a RIVIERA HOTEL AND CASINO and DOES 1 through 50, inclusive,<br><br>    Defendant. | Case No. 2:14-cv-00165-APG-VCF<br><br>**PLAINTIFFS' APPLICATION FOR WRIT OF ATTACHMENT** |

Pursuant to Nevada Revised Statute § 31.010 *et seq.* Plaintiffs RAYMOND SULLIVAN and JULIA CAUSEY ("Plaintiffs") hereby submit the following Application for Writ of Attachment, or in the alternative, for an order to show cause why an order for attachment should not issue, for all corporate partnership property subject to attachment, including commercial property owned by Defendant RIVIERA OPERATING CORPORATION d/b/a RIVIERA HOTEL AND CASINO at the physical location of 2901 South Las Vegas Boulevard, Las Vegas,

NV 89109, or any proceeds from the sale thereof, including but not limited to any funds deposited with a third-party escrow agent.

Defendant is in the process of closing its business and disposing of all its assets, and has admitted that it will not be able to service future debt obligations. Specifically, Defendant sold its sole asset and means of generating revenue, the Riviera Hotel & Casino property, on February 20, 2015. And, on May 4, 2015, Defendant intends to liquidate all remaining assets, cease operations, and dissolve. Thus, Plaintiffs seek a pre-judgment writ of attachment to provide security and protect their right to relief pending final adjudication of their claims.

This motion is based on this document, the Memorandum of Points and Authorities in support thereof, the declaration of Leah L. Jones and exhibits attached thereto, all accompanying exhibits, pleadings, papers, and records on file herein, all matters upon which judicial notice may be taken, any oral argument that may be presented, and upon such other matters the Court deems just and necessary.

DATED: April 15, 2015.

Respectfully submitted,
THIERMAN BUCK LLP


/s/Joshua D. Buck
Mark. R. Thierman
Joshua D. Buck
Leah L. Jones
*Attorneys for Plaintiffs*

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR WRIT OF ATTACHMENT

## I.   BRIEF SUMMARY OF THE CASE AND PROCEDURAL HISTORY

Plaintiffs Raymond Sullivan and Julia Causey filed this collective and class action complaint against Defendant Riviera Operating Corporation d/b/a Riviera Resort and Casino (hereinafter "Defendant" or "Riviera") in the Eighth Judicial District Court for the State of Nevada in and for the County of Clark on December 4, 2013. *See*, Doc. 1, pp. 10-24. Defendant removed the action to this Court on January 29, 2014 and, on February 5, 2014, moved to dismiss. *See*, Doc. 1; Doc 4.  Plaintiffs opposed Defendant's Motion to Dismiss and, on April 10, 2014, filed a Motion for Conditional Certification. *See*, Doc. 11. Shortly thereafter, the parties filed a proposed Discovery Plan and Scheduling Order. *See*, Doc. 13. However, on May 15, 2014, the Court temporarily stayed discovery pending resolution of Defendant's Motion to Dismiss, and ultimately granted Defendant's Motion on June 30, 2014. *See*, Doc. 23; Doc. 28. In its Order, the Court granted Plaintiffs' leave to amend within 30 days of the Order, and denied Plaintiffs' motion for circulation of notice as moot. *See*, Doc. 28.

Plaintiffs filed their currently operative Amended Complaint ("Complaint") on July 23, 2014, alleging various causes of action for unpaid wages on behalf of themselves and all similarly situated individuals under both the Fair Labor Standards Act ("FLSA") and the Nevada Revised Statute ("NRS"). *See*, Doc. 30. Specifically, Plaintiffs allege that Defendant failed to: (1) pay wages for all hours worked in violation of 29 U.S.C. § 201, et. seq; (2) pay overtime in violation of 29 U.S.C. § 207; (3) compensate for all hours worked in violation of NRS 608.016 and 608.140; (4) pay minimum wages in violation of the Nevada Constitution and NRS 608.250; (5) pay overtime in violation of NRS 608.018 and 608.140; (6) timely pay all wages due and owing in violation of NRS 608.020-050 and 608.140; (7) pay the correct overtime rate in violation of 29 U.S.C. § 207(e); and (8) comply with its contractual obligations.  Plaintiffs bring their FLSA causes of action as a collective action and their state law causes of action as a class action under Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), and do so on behalf of the two named

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

class members, Raymond Sullivan and Julia Causey, and on the behalf of the other putative class members, defined as: "All current and former non-exempt hourly paid employees who were employed by Defendant during the relevant time period and who were required to carry or use a cash bank in carrying out their employment tasks" (collectively "the Class" or "Class Members"). *See* Doc. 30, at ¶ 15.

Shortly thereafter, on July 29, 2014, Plaintiffs filed a renewed Motion for Conditional Certification. *See*, Doc. 31. On August 11, 2014, Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint. *See*, Doc. 32. On September 8, 2014, this Court held a hearing on Plaintiffs' Motion for Conditional Certification and Defendant's Motion to Dismiss. *See*, Doc. 40. The Court granted Defendants' Motion to Dismiss as to Plaintiffs' First, Third, Fourth, Fifth, Sixth, and Eighth Causes of Action, and granted Plaintiffs' Motion for Conditional Certification of the remaining claims. *See*, Doc. 43. On September 12, 2014, Plaintiffs filed a Request for Clarification of the Court's Amended Minute Order (Doc. 43) and Motion for Reconsideration of the Court's ruling on gap time liability. *See*, Doc. 44; Doc. 45. Plaintiffs Request for Clarification and Motion for Reconsideration are currently pending before the Court. Plaintiffs preserved their right to appeal.

In a hearing on September 19, 2014, the Court approved the form and specified the method for providing notice to potential class members. *See*, Doc. 50. Pursuant to the Court's Order, the Claims Administrator CPT Group mailed out notice to 177 potential opt-in plaintiffs. *See* Doc 30. Twenty-eight persons filed consents to sue with the Court prior to the Opt-in deadline of January 15, 2015. *Id*. Seven additional opt-in plaintiffs have since filed consents to sue.

On October 22, 2014, the parties filed and the Court approved an Updated Discovery Plan and Scheduling Order. *See*, Doc. 57; Doc 58. On October 24, 2014, Defendant answered Plaintiffs' Complaint, generally denying Plaintiffs' claims. *See*, Doc. 59. On February 25, 2015, Defendant propounded written discovery to all 28 opt-in plaintiffs, prompting a Motion for a Protective Order from Plaintiffs. *See*, Doc. 76. Plaintiffs' Motion is currently before the Court,

and discovery is ongoing.

## II.     LEGAL ARGUMENT

### A. This Court Should Issue a Writ of Attachment, or in the Alternative, an Order to Show Cause Why an Order for Attachment Should Not Issue.

Federal Rule of Civil Procedure § 64 provides that state law pre-judgment remedies, such as attachment, are available in federal court to secure the satisfaction of a potential judgment. The availability and application of such prejudgment remedies in federal court is governed by the law of the state in which the district court sits.[1] *Diane Holly Corp. v. Bruno & Stillman Yacht Co., Inc.*, 559 F.Supp. 559 (D.C.N.H. 1983); *c.f. Sanad v. Bernini Inc*. 2007 WL 2891436 (Nev. 2007) (applying Nevada law in analyzing application for a writ of attachment).

Nevada law provides for the pre-judgment remedy of attachment through NRS 31.010 *et seq.* Attachment is a prejudgment remedy that allows a creditor to have a lien on the debtor's assets until the final adjudication of the claim sued upon. *See generally, Sanad*, 2007 WL 2891436 (Nev. 2007); *see also*, *Kemp Bros. Constr., Inc. v. Titan Elec. Corp.* 146 Cal.App.4th 1474, 1476 (2007) ("Attachment is an ancillary or provisional remedy to aid in the collection of a money demand by seizure of property in advance of trial and judgment.") (citations and internal quotation marks omitted).

Nevada law provides two procedural mechanisms through which a plaintiff may obtain a pre-judgment writ of attachment; a plaintiff may ask the court to issue a writ of attachment after notice and hearing on the grounds stated in NRS 31.013, or may request that the court issue a writ of attachment without notice under the grounds stated in NRS 31.017. These alternative procedural mechanisms are not mutually exclusive, and a party may seek relief under both NRS 31.013 and 31.017 in the same application. *See Sanad*, 2007 WL 2891436. Regardless of the grounds for the application, or whether the writ of attachment is sought with or without notice,

---

[1] F.R.C.P. 64 further provides that, where such remedies are sought, "a federal statute governs to the extent it applies." Because "[f]ederal law in the United States does not provide directly for a writ of attachment," no such federal statutes apply in this case, and Nevada law governs. *See In re Pro-Fit Holdings Ltd*., 391 B.R. 850, at 856 n. 8 (Bkrtcy. C.D. Cal. 2008).

the applicant must support the application for a writ of attachment with an affidavit meeting the requirements of NRS 31.020.[2] Among other things, the affidavit must set forth clearly the nature of plaintiff's claim for relief and that the same is valid, and describe in reasonable and clear detail all facts that show one or more grounds for attachment.[3] If the plaintiff's application is for a writ of attachment without notice, and its affidavit, "alone or as supplemented by additional evidence, meets the requirements of subsection 1 of NRS 31.020," the court "*shall* order the clerk to issue a writ of attachment without notice to the defendant." NRS 31.022 (emphasis added). Alternatively, if the plaintiff's application is for a writ of attachment after notice and hearing, and the plaintiff's affidavit, "alone or as supplemented by additional evidence received by the court, meets the requirements of subsection 2 of NRS 31.020, the court shall issue an order directed to the debtor to show cause why the order for attachment should not be issued." NRS 31.024.

Here, the declarations, judicial record, and materials submitted by Plaintiffs in support of their application meet the requirements set forth in both NRS 31.020 subsections (1) and (2).

---

[2] Pursuant to NRS 53.045, "Any matter whose existence or truth may be established by an affidavit or other sworn declaration may be established with the same effect by an unsworn declaration of its existence or truth signed by the declarant under penalty of perjury."

[3] NRS 31.020 provides in full:

1. All applications to the court for an order directing the clerk to issue a writ of attachment *without notice* to the defendant shall be accompanied by the affidavit of the plaintiff or any other person having personal knowledge of the facts constituting one or more of the grounds for attachment, which affidavit or affidavits shall:

(a) Set forth clearly the nature of the plaintiff's claim for relief and that the same is valid.
(b) Set forth the amount which the affiant believes the plaintiff is entitled to recover from the defendant, and if there is more than one plaintiff or more than one defendant, the amount the affiant believes each plaintiff is entitled to recover or the amount that the plaintiff is entitled to recover from each defendant.
(c) Describe in reasonable and clear detail all the facts which show the existence of any one of the grounds for an attachment without notice to the defendant.
(d) Describe in reasonable detail the money or property sought to be attached and the location thereof if known.
(e) If the property sought to be attached is other than money, set forth to the best knowledge and information of the affiant, the value of such property less any prior liens or encumbrances.
(f) Name all third persons upon whom a writ of garnishment in aid of the writ of attachment will be served.
(g) In an action upon a foreign judgment attach a copy of the judgment to the affidavit for attachment as an exhibit.
(h) State whether, to the best information and belief of the affiant, the money or property sought to be attached is exempt from execution.

2. All applications to the court for an order directing the clerk to issue a writ of attachment *with notice* to the defendant shall be accompanied by an affidavit setting forth the item required by subsection 1, except that such affidavit may show the existence of any one of the grounds for attachment with notice.

Emphasis added.

Accordingly, this Court must order the clerk to issue a writ of attachment without notice, or at a minimum, must issue an order directing Defendant to show cause why Plaintiff's requested order for attachment should not be issued. *See,* NRS 31.022; NRS 31.024. Plaintiffs address each of NRS 31.020's requirements in turn below.

### 1. Supporting Declarations

In support of their application, Plaintiffs submit the Declarations of Leah L. Jones, named Plaintiffs Raymond Sullivan and Julia Causey, and opt-in plaintiff Blanca Aguilar. Collectively and individually, these persons have "personal knowledge of the facts constituting one or more of the grounds for attachment," and their declarations establish the following facts. *See* NRS 31.020(1) ("All applications to the court for an order directing the clerk to issue a writ of attachment without notice to the defendant shall be accompanied by the affidavit of the plaintiff or any other person having personal knowledge of the facts constituting one or more of the grounds for attachment…").

#### *a.  The nature and probable validity of Plaintiffs' claims*

NRS 31.020(1)(a) requires that a plaintiff's affidavit in support of an application for writ of attachment must "[s]et forth clearly the nature of the plaintiff's claim for relief and that the same is valid." For the purpose of securing a writ of attachment, a plaintiff must provide the Court with factual information demonstrating "the probable validity of the plaintiff's underlying claim against the defendant. If the court determines such claim is probably valid it *shall* order the clerk to issue a writ of attachment." NRS 31.026 (emphasis added); *c.f.* CCP § 481.190 (interpreting the same language in California law to require that, to establish the "probable validity" of a claim, an applicant must show "it is more likely than not" they will obtain a judgment against the defendant on their claim.).

### 1. Plaintiffs' Claims

In their Complaint, Plaintiffs allege that Defendant failed to: (1) pay wages for all hours worked in violation of 29 U.S.C. § 201, et. seq; (2) pay overtime in violation of 29 U.S.C. § 207;

(3) compensate for all hours worked in violation of NRS 608.016 and 608.140; (4) pay minimum wages in violation of the Nevada Constitution and NRS 608.250; (5) pay overtime in violation of NRS 608.018 and 608.140; (6) timely pay all wages due and owing in violation of NRS 608.020-050 and 608.140; (7) pay the correct overtime rate in violation of 29 U.S.C. § 207(e); and (8) comply with its contractual obligations. *See*, Doc. 30. This Court's ruling on Defendant's Motion to Dismiss narrowed Plaintiffs' currently viable causes of action to two: their Second and Seventh Causes of Action, for failure to pay overtime in violation of 29 U.S.C. § 207, and failure to pay the correct overtime rate in violation of 29 U.S.C. § 207(e), respectively.[4]

As relevant to Plaintiffs' Second Cause of Action, 29 U.S.C. Section 207(a)(1) provides as follows:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Plaintiffs allege that Defendant violated this provision "[b]y failing to compensate Plaintiffs and Class Members for the time spent engaging in off-the-clock activities . . . [thereby failing] . . . to pay Plaintiffs and Class Members overtime for all hours worked in excess of forty (40) hours in a week in violation of 29 U.S.C. Section 207(a)(1)." *See*, Doc. 30 at ¶ 39.

Similarly, in their Seventh Cause of Action, Plaintiffs allege that Defendant failed to pay the correct rate of overtime premium compensation for each overtime hour worked in violation

---

[4]   The Court granted Defendants' Motion to Dismiss as to Plaintiffs' First, Third, Fourth, Fifth, Sixth, and Eighth Causes of Action, and granted Plaintiffs' Motion for Conditional Certification of the remaining claims. *See*, Doc. 43. On September 12, 2014, Plaintiffs filed a Request for Clarification of the Court's Amended Minute Order (Doc. 43) and Motion for Reconsideration of the Court's ruling on gap time liability. *See*, Doc. 44; Doc. 45. Plaintiffs Request for Clarification and Motion for Reconsideration are currently pending before the Court. Additionally, Plaintiffs preserved their right to appeal.
   While this Court has thus dismissed all but Plaintiffs' Second and Seventh Causes of Actions, the facts set forth in the attached declarations support all eight causes of action alleged by Plaintiffs in their Complaint. In the event that this Court grants Plaintiffs' Request for Clarification, Motion for Reconsideration, or otherwise revives the previously dismissed claims, Plaintiffs argue that the facts set forth in support of this application establish the probable validity of such claims and provide additional grounds for the writ of attachment sought herein.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

of 29 U.S.C. § 207(e) by failing to include a lunch stipend in the regular rate of pay of Plaintiffs and Class Members. *See*, Doc. 30 at ¶ 73. More specifically, Plaintiffs allege that although "Defendant paid Plaintiffs and Class Members a lunch stipend of $31.75 per month . . . Defendant did not include the value of this stipend in the calculation of its regular rate of pay, nor did it include the value of the stipend in the regular rate of pay for purposes of calculating overtime compensation due." *See*, Doc. 30 at ¶ 70. Under the FLSA, the "regular rate" at which an employee must be paid includes "all remuneration for employment paid to, or on behalf of, the employee, divided by hours worked in a workweek." 29 U.S.C. § 207(e). Under the Code of Federal Regulations, lunch stipends must be included in an employee's "regular rate" of pay:

> The expenses for which reimbursement is made must in order to merit exclusion from the regular rate under this section, be expenses incurred by the employee on the employer's behalf or for his benefit or convenience. If the employer reimburses the employee for expenses normally incurred by the employee for his own benefit, he is, of course, increasing the employee's regular rate thereby. ***An employee normally incurs expenses in traveling to and from work, buying lunch, paying rent, and the like. If the employer reimburses him for these normal everyday expenses, the payment is not excluded from the regular rate as "reimbursement for expenses."*** Whether the employer "reimburses" the employee for such expenses or furnishes the facilities (such as free lunches or free housing), the amount paid to the employee (or the reasonable cost to the employer or fair value where facilities are furnished) enters into the regular rate of pay as discussed in §778.116.

29 C.F.R. § 778.217(d) (emphasis added); *see also*, 29 C.F.R. § 531.37(b) ("Where board, lodging, or other facilities are customarily furnished as additions to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay.") (citing *Walling* v. *Alaska Pacific Consolidated Mining Co.,* 152 F.2d 812 (9th Cir. 1945), *cert. denied,* 327 U.S. 803).

       2.  <u>Facts Relating to Defendant's Off-The-Clock Policy</u>

The attached declarations provide specific factual support for Plaintiffs' allegations. As an initial matter, these declarations establish that Plaintiffs and class members are or were

employed by Defendant as non-exempt hourly employees in its Las Vegas casino during the relevant time frame. *See* Declaration of Raymond Sullivan (hereinafter "Sullivan Dec."), attached hereto as Exhibit A, at ¶ 2; Declaration of Julia Causey (hereinafter "Causey Dec."), attached hereto as Exhibit B, at ¶ 2; Declaration of Blanca Aguilar (hereinafter "Aguilar Dec."), attached hereto as Exhibit C, at ¶ 2. Throughout this time period, Defendant maintained a strict policy against working overtime. *See*; Sullivan Dec. at ¶¶ 7 and 9; Causey Dec. at ¶¶ 8 and 10; Aguilar Dec. at ¶¶ 7 and 10. Indeed, Defendant specifically told employees that they could not incur overtime either before or after their shift. *See* Sullivan Dec. at ¶¶ 7 and 9; Causey Dec. at ¶¶ 8 and 10; Aguilar Dec. at ¶ 7 and 10. Although a prohibition on overtime, in of itself, does not run afoul of the FLSA, the manner in which Defendant enforced its no-overtime policy violates the FLSA. Specifically, in order to eliminate overtime premium pay, Defendant regularly suffered, permitted and even directed employees to work hours in excess of 40 per week without compensation—i.e., "off-the-clock." *See*; Sullivan Dec. at ¶ 15; Causey Dec. at ¶ 13; Aguilar Dec. at ¶ 12. This was achieved either by rounding hours so that employees who were technically "on-the-clock" did not receive pay for all their recorded hours worked and/or by having employees perform work after they had clocked out or before they clocked in. *See e.g.,* Sullivan Dec. generally; Causey Dec. generally; Aguilar Dec. generally. By maintaining and enforcing this policy, Defendant forced Plaintiffs and class members to perform work "off-the-clock." In reality, Defendant's "no overtime policy" was a policy or practice of "no pay for overtime suffered, permitted and/or required" by the employer. *See e.g.,* Sullivan Dec. generally; Causey Dec. generally; Aguilar Dec. generally.

Defendant forced employees to work without recording their hours by requiring them to conduct banking activities off-the-clock and without recording their time. *See* Sullivan Dec. at ¶¶ 6, 8, 10, 11, and 12; Causey Dec. at ¶¶ 7, 8, 10, 11, 12, and 14; Aguilar Dec. at ¶. As demonstrated by the sample declarations submitted in support of this Motion, Defendant required all employees who used a cash bank in carrying out their respective employment duties to frequent the cashier's

cage before clocking in and after clocking out. *See* Sullivan Dec. at ¶¶ 4, 5, 6, 8, 11 and 12; Causey Dec. ¶¶ 4, 5, 6, 7, 9, 12, and 14; Aguilar Dec. at ¶¶ 4, 5, 6, 8, 11 and 12.

Employees began their work activities by collecting a bank of cash through a cage cashier prior to clocking in. *See* Sullivan Dec. at ¶ 5; Causey Dec. at ¶ 6; Aguilar Dec. at ¶ 5. Upon information and belief all employees who carried a cash bank—bartenders, slot technicians who pay out jackpots, cashiers of the retail shops and front desk, anyone who provided change to guests—would have to go to the main cage, wait in line for an available cashier, count and check their bank for proper value and denominations, then sign a receipt verifying such with the cage attendant. *See* Sullivan Dec. at ¶¶ 4-6; Causey Dec. at ¶¶ 4-7; Aguilar Dec. at ¶¶ 4-7.  It would take employees 15 minutes or more based on the number of employees in line and the number of available cage attendants; usually only one attendant is on duty at any given time. *See* Sullivan Dec. at ¶ 6; Causey Dec. at ¶ 7; Aguilar Dec. at ¶ 7. Not until the employee had their verified bank could they then proceed to their workstation and clock in. *See* Sullivan Dec. at ¶ 8; Causey Dec. at ¶ 7; Aguilar Dec. at ¶ 8. Defendant specifically instructed its employees that, "Before clocking in, each person needs to be in complete uniform and in possession of his or her bank." Aguilar Dec. at ¶ 8.

At the end of their shifts employees were not allowed to clock-out any time except between :03 or :05 after their shift. *See,* Sullivan Dec. at ¶ 6; Causey Dec. at ¶ 10; Aguilar Dec. at ¶ 10. However, reconciling their banks could take up to 15 minutes or more. *See,* Sullivan Dec. at ¶ 11; Causey Dec. at ¶ 12; Aguilar Dec. at ¶ 11. In other words, employees were required to clock out and then do their banking work on their own time. When employees did clock in early, or clock out late, Defendant failed to follow its own rounding policy, and instead merely rounded the time down to the beginning or end of the employee's regularly scheduled shift, stealing additional time from plaintiffs.

Plaintiffs have included sample Riviera Cashier's Report Slips (hereinafter "Cage Receipts") attached to their declarations that show the actual time Plaintiffs dropped their bank with the cage cashier. *See* Sullivan Dec. at ¶ 12; Causey Dec. at ¶ 14. For example, the Sullivan Dec. includes two (2) sample Cage Receipts, one dated 9/10/13 and one dated 11/4/13. *See*

**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

Sullivan Dec. at ¶ 12. The time that Mr. Sullivan was actually able to drop his bank on 9/10/13 was 1:11 a.m.; the time that he was actually able to drop his bank on 11/4/13 was 9:14 a.m. *See id.* However, in accord with company policy. Mr. Sullivan was not allowed to and did not clock out any time later than :05 after the hour. *See* Sullivan Dec. at ¶ 9. Because the :03 and the :05 clock punches are rounded to the nearest whole hour, Mr. Sullivan was required to work 11 minutes without pay on September 10, 2013 and was required to work 14 minutes without pay on November 4, 2013.

Likewise, the Causey Dec. includes two (2) sample Cage Receipts, one dated 9/16/13 and one dated 10/28/13. *See* Causey Dec. at ¶ 14. The time that Ms. Causey was actually able to drop her bank on 9/16/13 was 1:14 a.m.; the time she was actually able to drop her bank on 10/28/13 was 6:18 p.m. *See id.* However, as per company policy she was not allowed to and did not clock out any time later than :03 after the hour. *See* Causey Dec. at ¶ 10. Since the :03 hour (3 minutes after the shift end) was rounded to the nearest 15 minutes, the company's own records show Ms. Causey was require to work without compensation, at least 14 minutes on September 16, 2013 and 18 minutes on October 28, 2013.

For almost all employees who had a cash bank, reconciling their banks at the end of their shift usually took 15 to 20 minutes or more each shift, which time was never compensated, because employees had to first wait for their relief, then reconcile all transactions made through their bank, hand count and track each denomination, and finally wait in line with their fellow employees, again, to return their bank to the cage attendant. *See* Sullivan Dec. at ¶¶ 8, 10-11, Causey Dec. at ¶¶ 9, 11-12; Aguilar Dec. at ¶. Upon information and belief, neither Plaintiffs nor any of the employees required to carry a cash bank were compensated for the time spent collecting or reconciling their cash banks prior to or after their regularly scheduled shift times.

In sum, Plaintiffs and class members worked at least 30-minutes off the clock and without compensation each and every work day. *See*; Sullivan Dec. at ¶ 13; Causey Dec. at ¶ 15; Aguilar Dec. at ¶ 12. Because this time is in addition to Plaintiffs' regularly scheduled forty hour workweek, Plaintiffs should have been paid an overtime premium for the additional two and a

**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

half—or more—hours of work that Plaintiffs performed every week above and beyond their regularly scheduled forty-hour workweek. *See*; Sullivan Dec. at ¶ 13; Causey Dec. at ¶ 15; Aguilar Dec. at ¶ 12.

### 3. Facts Relating to Defendant's Failure to Include the Meal Payment in the Overtime Rate

In addition to failing to pay employees for time spent collecting and reconciling cash banks, Defendant likewise failed to include a $1.75 meal payment into the regular rate of pay and, thus, failed to include the value of the payment in the regular rate of pay for purposes of calculating overtime compensation due. *See* Sullivan Dec. at ¶ 14; Causey Dec. at ¶ 16; Aguilar Dec. at ¶ 13. Plaintiffs have included sample pay stubs attached to their declarations that include a line item for meal allowance. *See* Sullivan Dec. at ¶ 12; Causey Dec. at ¶ 14. Upon information and belief, this meal payment was not factored in to employees' overtime rate.

In sum, each of the named Plaintiffs along with one of the opt-in plaintiffs have signed sworn declarations showing actual, personal knowledge of the relevant facts that Defendant failed to pay Plaintiffs and putative class members according to the FLSA, Nevada law, and Defendant's employment contract with Plaintiffs. *See* Declaration of Leah L. Jones (hereinafter "Jones Dec.") at ¶¶ 6-8. Because Plaintiffs' application for a writ of attachment is supported by sworn declarations stating with particularity that Defendant failed to pay its employees in compliance with the FLSA, Nevada law, and Defendant's employment contract with Plaintiffs, Plaintiffs have established the probable validity of their claims against Defendant.

### b. *Amount sought in damages*

NRS 31.020(1)(b) requires that a plaintiff's affidavit in support of an application for writ of attachment must "[s]et forth the amount which the affiant believes the plaintiff is entitled to recover from the defendant, and if there is more than one plaintiff or more than one defendant, the amount the affiant believes each plaintiff is entitled to recover or the amount that the plaintiff is entitled to recover from each defendant."

Here, Plaintiffs seek $730,920.96 on behalf of themselves and putative class members in

1 underpaid wages, overtime wages, interest, damages, and penalties, not including attorney's fees
2 and costs, in relief for their Second and Seventh Causes of Action. (See Interim Report, at p. 2;
3 Jones Dec. at ¶ 9.). Also, Plaintiffs' counsel are representing Plaintiffs and putative class members
4 on a contingency fee basis whereby the amount awarded to Plaintiffs' counsel may be up to 35%
5 of the recovery as approved by the court. Should the court award Plaintiffs' counsel with the full
6 35%, counsel fees would equal a sum in excess of $255,822.34 relating to Plaintiffs' FLSA
7 claims. Thus, Plaintiffs request that this Court order a writ of attachment be issued in the amount
8 of $986,743.30. (*See* Jones Dec. at ¶ 12.).

Additionally, as evidenced by the Interim Report submitted in support of this application, damage amounts for Plaintiffs' remaining causes of action are readily ascertainable should this Court grant Plaintiffs' Request for Clarification, Motion for Reconsideration, or otherwise revive Plaintiffs' previously dismissed causes of action. In relief for their Breach of Contract and Nevada statutory claims, Plaintiffs seek damages in the amount of $2,455,972.00, not including attorney's fees and costs. (See Interim Report, at p. 2; Jones Dec. at ¶ 9.). In relief for their minimum wage claims, Plaintiffs seek damages in the amount of $680,029.00, not including attorney's fees and costs. (See Interim Report, at p. 2; Jones Dec. at ¶ 9.). Additionally, Plaintiffs seek $742,125.60 in waiting time penalties. (See Interim Report, at p. 2; Jones Dec. at ¶ 9.). If the Court determines that any of these claims are viable, Plaintiffs request that the damages sought in relief for such claims be added to the amount of any writ of attachment issued by the Court.

### c. *Grounds*

NRS 31.020(1)(c) requires that a plaintiff's affidavit in support of an application for writ of attachment must "[d]escribe in reasonable and clear detail all the facts which show the existence of any one of the grounds for an attachment without notice to the defendant," which are listed in NRS 31.017. Alternatively, where an applicant seeks a writ of attachment after notice and hearing, NRS 31.020(2) provides that "such affidavit may show the existence of any one of the grounds for attachment with notice" listed in NRS 31.013. In this case, grounds exist to

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

support a writ of attachment under both provisions.

> *i. Grounds exist for ordering a writ of attachment without notice pursuant to NRS 31.017.*

Pursuant to NRS 31.017(5), grounds for a writ of attachment lie "[w]here the defendant is about to give, assign, hypothecate, pledge, dispose of or conceal the defendant's money or property or any part thereof and the defendant's money or property remaining in this State or that remaining unconcealed will be insufficient to satisfy the plaintiff's claim."

Simply put, Defendant is closing its business, disposing of all its assets, and has admitted that it will not be able to service future debt obligations. Defendant's most recent 10-K Annual Report, filed with the United States Securities and Exchange Commission (SEC) on March 31, 2015, paints a dire picture. In its Annual Report, Defendant advises investors of its "Sale of Substantially All Assets and Termination of Business." Annual Report, at p. 1; Jones Dec at ¶ 14. Defendant explains:

> On February 20, 2015, the Company entered into, and simultaneously closed, an Asset Purchase Agreement (the "Purchase Agreement") with Las Vegas Convention and Visitors Authority, a local governmental entity of the State of Nevada (the "Buyer"). Pursuant to the Purchase Agreement, Buyer purchased certain assets of the Company, including the real property located at 2901 Las Vegas Boulevard South, Las Vegas, Nevada 89109 [the Riviera Hotel & Casino] and all structures and improvements located on the property (collectively, the "Property"), and certain other assets (the "Transaction") for a total purchase price of up to $182.5 million (the "Purchase Price").
>
> The Purchase Agreement generally provides that the Company will terminate its business operations within 180 days of the close of the Transaction (the "Business Closure"). The Company will be responsible for the Business Closure, and the Buyer will take possession of the Property once there are only minimal assets remaining on the premises.

Annual Report, at p. 1; Jones Dec at ¶ 14.

Defendant's sale of the Riviera Hotel & Casino is especially alarming and concerning to

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email: info@thiermanbuck.com www.laborlawyer.net

Plaintiffs given Defendant's admission that "We do not have material assets or operations other than Riviera Hotel & Casino. Therefore, we are entirely dependent upon this property for our cash flow." Annual Report at p. 11; Jones Dec at ¶ 14. Throughout its Annual Report, Defendant repeatedly warns investors of the severe impact the liquidation of its assets and cessation of operations will have on its ability to comply with its economic obligations. Among its numerous warnings to financial investors, Defendant advises:

- "**As a result of our sale of certain long-lived assets, future expected cessation of operations and eventual liquidation, there is substantial doubt about our ability to continue as a going concern**." Annual Report at p. 9 (emphasis in original)
- "We have incurred substantial losses since the Substantial Consummation Date, and may continue to incur losses in the Future." Annual Report at p. 10
- "There can be no assurance that we will operate profitability in the future or that we will have adequate working capital to meet our obligations as they become due."
- "We have been unable to achieve positive cash flow which could prevent us from funding operations and servicing any future debt obligations" Annual Report at p. 10

In other words, Defendant admitted to its investors, in its Annual Report filed with the SEC, that it is "entirely dependent upon" the Riviera Hotel & Casino property, which it just sold, "for our cash flow," and its existing and future inability to achieve positive cash flow could prevent it from "servicing any future debt obligations," like those arising out of Plaintiffs' claims in the case at hand. Through its Annual Report, Defendant admitted and clearly established grounds for a writ of attachment under NRS 31.017(5): Defendant is liquidating all assets and Defendant's money or property remaining in this State will be insufficient to satisfy Plaintiffs' claim.

It is important to note that Defendant is not yet in possession of all proceeds from the sale of the Riviera Hotel & Casino. The Transaction provides that "[a] portion of the Purchase Price has been deposited with a third-party escrow agent under an Escrow Agreement," but advises that those funds are currently being used to pay the costs of the Business Closure, and any remaining "escrowed amounts will be released to the Company upon completion of the Business Closure."

Importantly, "[o]n March 11, 2015, **the Company announced the expected closure date of the Riviera Hotel & Casino as May 4, 2015** at noon." Annual Report, at p. 1 (emphasis added); Jones Dec at ¶ 14.

Thus, while at least some of the proceeds from Defendant's sale of the property remain in the hands of a third party, time is of the essence. This is an additional and compelling reason supporting the issuance of a writ of attachment without notice to Defendant. Defendant has clearly stated its intent to terminate business and dispose of all assets; it cannot be given the opportunity to dispose of its dwindling assets and deprive Plaintiffs of the relief to which they are entitled.

> *ii. Grounds exist for ordering a writ of attachment after notice and hearing pursuant to NRS 31.013.*

Pursuant to NRS 31.013(3), grounds for a writ of attachment lie "where the court finds that extraordinary circumstances exist which will make it improbable for the plaintiff to reach the property of the defendant by execution after the judgment has been entered." Here, Defendant's admitted liquidation of assets and cessation of operations, as discussed in the preceding section, make it extremely improbably that Plaintiffs will be able to reach the property of the defendant by execution after judgment has been entered. By the time Plaintiffs obtain a judgment in this matter, Defendant will have ceased operations and liquidated its assets, and it is likely that Defendant will no longer hold *any* property upon which Plaintiffs may execute judgment.

Accordingly, this Court may order the clerk to issue a writ of attachment after notice and hearing pursuant to the grounds stated in NRS 31.013(3). However, given the urgency of the situation, and in light of concurrent grounds under NRS 31.017(5), Plaintiffs ask that this Court issue a writ of attachment without notice to ensure that attachment is effective in securing relief for Plaintiffs' claims.[5]

---

[5] Additionally, in the event this Court determines that Plaintiffs may proceed with their breach of contract claim, that claim would provide another ground for issuing a writ of attachment under NRS 31.013(1)(1). That section states that a claim for breach of contract constitutes grounds for a prejudgment writ of attachment in an action "upon a contract, express or implied, for the direct payment of money," so long as ". . . the contract is not secured by mortgage, lien or pledge upon real or personal property situated in this state."

### d. *Property description*

NRS 31.020(1)(d) requires that a plaintiff's affidavit in support of an application for writ of attachment must "[d]escribe in reasonable detail the money or property sought to be attached and the location thereof if known." Here, Plaintiffs seek to attach all corporate partnership property subject to attachment, including commercial property owned by Defendant RIVIERA OPERATING CORPORATION d/b/a RIVIERA HOTEL AND CASINO at the physical location of 2901 South Las Vegas Boulevard, Las Vegas, NV 89109, or any proceeds from the sale thereof, including but not limited to any funds deposited with a third-party escrow agent.

### e. *Value of property*

NRS 31.020(1)(e) requires that a plaintiff's affidavit in support of an application for writ of attachment must, "[i]f the property sought to be attached is other than money, set forth to the best knowledge and information of the affiant, the value of such property less any prior liens or encumbrances." Plaintiffs understand that Defendant's property, the Riviera Hotel & Casino, has already been sold to the Las Vegas Convention and Visitors Authority. However, to the extent that Defendant retains any interest in the property, the value listed at sale was $182.5 million. *See* Annual Report, p. 1.

### f. *Property not exempt*

NRS 31.020(1)(h) requires that a plaintiff's affidavit in support of an application for writ of attachment must "[s]tate whether, to the best information and belief of the affiant, the money or property sought to be attached is exempt from execution."[6] Based on information and belief, the money or property sought to be attached through this application is not exempt from

---

[6] Here, Plaintiffs' claims are for unpaid wages due and owing pursuant to an unsecured employment contract for the direct payment of money. *See* Complaint, generally. The employee Plaintiffs had an express contract of employment with Defendant, whereby Plaintiffs and the class accepted Defendant's offer that they be paid for all hours worked, in accordance with all state and federal laws, in exchange for the wages offered by Defendant. Plaintiffs kept up their end of the bargain by performing the work requested by Defendant. Defendant, however, breached its duty under the contract by failing to pay Plaintiffs and class members according to the express contract and incorporated law.

[6] NRS 31.020(1)(f) & (g) are inapplicable to this application, as Plaintiffs do not anticipate serving a writ of garnishment on any third parties, and this is not an action upon a foreign judgment.

execution. *See* Jones Dec. at ¶ 13.

## III.     CONCLUSION

Because Plaintiffs have met the requirements of F.R.C.P 64 and NRS § 31.010 *et seq.* they respectfully ask that this Court issue a Writ of Attachment, or in the alternative, an order to show cause why an order for attachment should not issue.

Dated this 15th day of April, 2015.

THIERMAN BUCK, LLP

By: /s/ Joshua D. Buck
Mark R. Thierman
Joshua D. Buck
Leah L. Jones
*Attorneys for Plaintiffs*
